IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| A.M., *et al.*, § | | |
| § | | |
| Plaintiffs, § | | |
| § | | |
| v. § | | Civil Action No. 3:07-CV-0272-N |
| § | | |
| PAUL ELLIOTT CASH, *et al.*, § | | |
| § | | |
| Defendants. § | | |

## **ORDER**

Plaintiffs A.M., Richard Dale McAllum, Shelby Voda McCallum, A.T., Darrell Ray Thomas, and Joni Ann Thomas (collectively, "Plaintiffs") filed a Motion for Preliminary Injunction [13] on April 9, 2007. Because the Court concludes that Plaintiffs are unlikely to succeed on the merits of their First and Fourteenth Amendment claims, the Court denies the motion.

### I. ORIGINS OF THE CASE

This case arises from an incident in which Burleson High School ("BHS") officials enforced the BHS dress code against plaintiffs A.M. and A.T.,[1] both students at BHS, by requiring them to stop carrying purses bearing the images of the Confederate battle flag.[2]

---

[1] Plaintiffs A.M. and A.T. are the minor children of the other named plaintiffs and are designated by their initials. After the filing of the motion for preliminary injunction, additional plaintiff M.T. intervened, and A.M. and A.T. have graduated.

[2] The Confederate battle flag, or St. Andrew's Cross, was not the official flag of the Confederate States of America. *See Coleman v. Miller*, 885 F. Supp 1561, 1564 (N.D. Ga. 1995) (noting the difference between the "Confederate national flag, also known as the 'Stars

Plaintiffs filed this suit seeking damages and declaratory and injunctive relief, arguing that BHS's enforcement of the dress code violates A.M. and A.T.'s constitutional rights under the First and Fourteenth Amendments.

### A. Racial Hostilities at BHS

The Burleson Independent School District, of which BHS is a part, has adopted a uniform dress code that applies to all students at BHS. The dress code states that "there will be no tolerance for clothing or accessories that has inappropriate symbolism, especially that which discriminates against other students based on race, religion, or sex." App'x to Pls.' Mot. for Prelim. Inj., at 19. Recent history of racial hostility at BHS, coupled with the overt use of the Confederate battle flag as a symbol of that hostility, has led the school to interpret this language to prohibit the display of the Confederate battle flag.

As shown in the preliminary injunction record, Burleson ISD first began experiencing noticeable racial tensions during the 2002-2003 academic year when a student at BHS waived the Confederate battle flag in the face of an African-American athlete from a rival school. As a result of the incident, the principal of BHS met with members of the opposing

---

and Bars'" and the Confederate battle flag carried by Confederate troops during the civil war, which "depict[ed] a blue St. Andrew's cross on a red field."). During the last half of the Twentieth Century, however, it became more associated in the public mind with the Confederacy than the official flag. *See* Tyler T. Ochoa, *Patent and Copyright Term Extension and the Constitution: A Historical Perspective*, 49 J. COPYRIGHT SOC'Y AM. 19, 125 (2001) (explaining that the Confederate battle flag is "more familiar" than the Stars and Bars); Alexander Tsesis, *The Problem of Confederate Symbols: A Thirteenth Amendment Approach*, 75 TEMP. L. REV. 539, 601 (discussing the "revival of interest in Confederate symbolism during the 1950's," as well as the incorporation of the Confederate battle flag into many southern state flags as an expression of state pride).

team, as well as with the principal of the school, to apologize for the BHS student's behavior. Following this incident, displays of the Confederate battle flag by BHS students continued at athletic events. According to BHS officials, these displays were apparently used as a means of racial intimidation, as the displays occurred only in situations where the opposing team was predominantly African-American.

Displays of the Confederate battle flag occurred both on and off campus throughout the 2002-2003 academic year. At times, such displays provoked violence between BHS students and African-American students from other schools. For instance, at an athletic event during the 2002-2003 school year, a fight broke out between BHS students and students from a predominantly African-American school.

Furthermore, as a result of the evident racial hostilities between BHS students and students from predominantly African-American schools, the issue of race relations was raised at a district University Interscholastic League ("UIL") meeting. Specifically, attendees of the meeting noted that BHS had a reputation within the district as being openly hostile to African-Americans, as evidenced by the display of the Confederate battle flag during athletic events.

BHS has continued to experience racial hostilities, both before and after the incident in which BHS enforced the dress code against A.M. and A.T. According to BHS, racial hostilities, including the use of racial slurs and other incidents involving the Confederate battle flag, have continued since the beginning of the 2004-2005 school year. For example, on the day following the incident with A.M. and A.T. – Martin Luther King Day –

unidentified students raised the Confederate battle flag on the BHS flag pole and spray painted a symbol resembling the Confederate battle flag's "stars and bars" on the concrete near the pole. Additionally, a variety of racially hostile graffiti has appeared in the boys' bathroom at BHS, including the phrases "the South will rise again" and "the white man marches on."

### *B. BHS's Enforcement of the Dress Code Against A.M. and A.T.*

On the first day of school in January of 2006, A.M. and A.T. came to school carrying purses bearing the images of the Confederate battle flag. According to Plaintiffs, A.M. and A.T. wore their purses as an expression of pride in their Southern heritage and did not intend to make any sort of racial statement by the display. A.M. and A.T. were referred to the campus administration for appropriate action pursuant to the prohibition of Confederate battle flag displays. Although the school gave both students the opportunity to call home and have their purses retrieved, or to leave the purses in the office and retrieve them at the end of the day, both students opted to go home for the day, refusing to relinquish the purses. They were not suspended.

Plaintiffs appealed the prohibition on displays of the Confederate battle flag to the principal of BHS, to the Superintendent, and to the Burleson ISD Board of Trustees. These appeals were denied. Plaintiffs then filed suit in this Court, and now move for the Court to issue a preliminary injunction enjoining BHS from enforcing the Confederate battle flag prohibition.

## II. STANDARD FOR PRELIMINARY INJUNCTION

The decision to grant or deny a preliminary injunction lies within the sound discretion of the district court. *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985). A preliminary injunction is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion. *Harris County v. CarMax Auto Superstores, Inc.*, 177 F.3d 306, 312 (5th Cir. 1999). To obtain a preliminary injunction, the movant must establish the following: (1) a substantial likelihood that the movant will ultimately prevail on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the preliminary injunction is denied; (3) that the potential injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that granting the preliminary injunction will not disserve the public interest. *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 464 (5th Cir. 2003).[3]

## III. PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THEIR FIRST AMENDMENT CLAIM

A special body of jurisprudence surrounds First Amendment disputes arising in public school settings. High school students, like all Americans, enjoy the freedoms afforded by the First Amendment. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969) ("It can hardly be argued that teachers and students shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."). However, "the constitutional

---

[3] Because the Court finds that Plaintiffs fail to show a likelihood of success on the merits, it does not reach the other three factors.

rights of students are not automatically coextensive with the rights of adults in other settings." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986). Rather, the special characteristics of the school environment require a balancing of the students' interest in free expression with the corresponding interest of furthering the educational mission of the schools. *See id.* at 681 ("The undoubted freedom to advocate unpopular and controversial views in schools and classrooms must be balanced against the society's countervailing interest in teaching students the boundaries of socially appropriate behavior."). Stated otherwise, "a school need not tolerate student speech that is inconsistent with its basic educational mission, even if similar speech would not be subject to censor outside the school setting." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (internal citations and quotations omitted). Accordingly, the Supreme Court has held that "school officials may impose reasonable restrictions on the speech of students, teachers, and other members of the school community." *Id.* at 267.

The Fifth Circuit has identified four categories of school regulations aimed at student speech, each falling under a different standard of review. *Porter v. Ascension Parish Sch. Bd.*, 393 F.3d 608, 615 n.16 (5th Cir. 2004). These categories are: (1) school regulations directed at specific student viewpoints; (2) school regulations governing student expression involving lewd, vulgar, obscene or offensive speech; (3) school regulations governing student speech related to school-sponsored activities; and (4) school regulations that are viewpoint neutral and fall into none of the previous three categories. Because the Court concludes that BHS's prohibition on displays of the Confederate battle flag falls into the first

category, which governs viewpoint-specific regulations, the Court will not analyze the regulation under the latter three categories.[4]

Viewpoint-specific regulations are governed by the standard set forth by the Supreme Court in *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). Under *Tinker*, "school officials may regulate student speech when they can demonstrate that such speech would 'substantially interfere with the work of the school or impinge on the rights of other students.'" *Porter*, 393 F.3d at 615 (quoting *Tinker*, 393 U.S. at 508). School authorities, however, are not required to wait until disorder occurs before imposing regulations on speech. *West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358, 1366 (10th Cir. 2000) ("The fact that a full-fledged brawl had not yet broken out over the Confederate flag does not mean that the [school] district was required to sit and wait for one [before enacting a prohibition on display of Confederate flags]."); *Phillips v. Anderson County Sch.*

---

[4] Defendants argue that the Supreme Court's decision in *Fraser*, which allows schools to prohibit obscene and offensive language without a showing of substantial disruption, is also applicable because the Confederate Flag is an "offensive" symbol of racism and its display is inconsistent with Burleson ISD's mission to promote racial harmony. In a recent decision, however, the Supreme Court clarified the scope of *Fraser*, explaining that *Fraser* "should not be read to encompass any speech that could fit under some definition of 'offensive,'" because "after all, much political and religious speech might be perceived as offensive to some." *Moore v. Frederick*, __ U.S. __, 2007 WL 1804317, at *10 (June 25, 2007). The Court, therefore, will analyze BHS's regulation under the viewpoint-specific analysis set forth in *Tinker*. Furthermore, this approach is consistent with the approach taken by numerous other courts that have applied *Tinker* to regulations involving the Confederate battle flag. *See D.B. ex rel. Brogdon v. Lafon*, 217 F. App'x 518, 522-24 (6th Cir. 2007); *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 252-58 (3d Cir. 2002); *West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358, 1365-67 (10th Cir. 2000); *Melton v. Young*, 465 F.2d 1332, 1335 (6th Cir. 1972); *Phillips v. Anderson County Sch. Dist. Five*, 987 F. Supp. 488, 492-93 (D.S.C. 1997).

*Dist. Five*, 987 F. Supp. 488, 492 (D.S.C. 1997) ("School authorities, however, are not required to wait until disorder or invasion occurs." (citing *Quarterman v. Byrd*, 453 F.2d 54, 58 (4th Cir. 1971))). Although mere speculation that disruption will occur is not enough to support a viewpoint-specific regulation, courts have generally sustained such regulations when school authorities can "demonstrate . . . facts which might reasonably [support] a forecast [of] substantial disruption of or material interference with school activities." *Tinker*, 393 U.S. at 514; *see, e.g.*, *D.B. ex rel. Brogdon v. Lafon*, 217 F. App'x 518, 523-24, 2007 WL 541594, at *4 (6th Cir. 2007); *Scott v. Sch. Bd. of Alachua County*, 324 F.3d 1246, 1249 (11th Cir. 2003); *West*, 206 F.3d at 1366-67; *Phillips*, 987 F. Supp. at 493.

The Court finds that BHS has satisfied the *Tinker* standard. BHS authorities contend that they reasonably anticipated, based upon the ongoing racial hostilities and the use of the Confederate battle flag as a symbol of that hostility, that a substantial and material disruption of the educational process would result if they continued to allow unregulated display of the Confederate battle flag. This was a reasonable conclusion. BHS experienced a series of racial incidents prior to the imposition of the Confederate battle flag ban, at least one of which directly involved use of that flag as a means of intimidation. Other incidents included hostile confrontations between BHS students and African-American students from rival schools and at least one fight occurred at a high school sporting event. In fact, the racial tensions were severe enough to warrant discussion at a UIL meeting, in which concern was expressed over BHS students' overt use of the Confederate battle flag as a racist symbol at sporting events. Thus, based upon these facts, BHS authorities had a reasonable basis for

concluding that display of the Confederate battle flag would cause serious disruption.[5] *See, e.g.*, *D.B. ex rel. Brogdon*, 217 F. App'x at 523 ("Even without evidence that Confederate Flag displays had been the direct cause of past disruptions, school officials reasonably could surmise that such displays posed a substantial risk of provoking problems in the [racially hostile] atmosphere then existing."); *West*, 206 F.3d at 1367 ("The history of racial tension in the district made administrators' and parents' concerns about future substantial disruptions from possession of Confederate flag symbols at school reasonable."). Furthermore, in light of the ongoing racial hostility at the school, it is not the Court's place to second-guess this decision. *See Scott*, 324 F.3d at 1247 ("Short of a constitutional violation based on a school administrator's unsubstantiated infringement on a student's speech or other expressions, this Court will not interfere with the administration of a school."); *West v. Derby Unified Sch. Dist. No. 260*, 23 F. Supp. 2d 1223, 1232 (D. Kan. 1998) ("Moreover, 'the determination of what manner of speech in the classroom or in school assembly is appropriate properly rests with the school board.'" (quoting *Fraser*, 478 U.S. at 683)), *aff'd*, 206 F.3d 1358 (10th Cir. 2000).

Plaintiffs do not dispute the occurrence of any of the cited incidents. Rather, Plaintiffs assert that the prior disruptions caused by display of the Confederate battle flag, even when

---

[5] Thus, Plaintiffs' reliance on *Castorina v. Madison County Sch. Bd.*, 246 F.3d 536 (5th Cir. 2001) is misplaced. BHS has demonstrated a history of racial hostility and intimidation involving the Confederate battle flag that was lacking in *Castorina*. *See Castorina*, 246 F.3d at 542 ("Viewing the facts in the light most favorable to the students, the school has banned only certain racial viewpoints without any showing of disruption.").

accompanied by racial hostility, are insufficient for BHS authorities to reasonably conclude that the nonaggressive and nonintimidating display of the Confederate battle flag as an expression of pride in Southern heritage would cause disruption. Specifically, Plaintiffs argue that the prior incidents relied on by BHS authorities to support the regulation are insufficient because they did not result from the peaceful display of the Confederate battle flag as an expression of ancestral pride, but rather its misuse as a symbol of racism and white supremacy. In this sense, Plaintiffs claim, the prior incidents referred to by BHS do not constitute disruptions caused by similar speech; therefore, the prior incidents are insufficient to support the "well-founded expectation of disruption" called for under *Tinker*. Pls.' Reply to Defs.' Resp. to Mot. for Prelim. Inj., at 4 (quoting *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 212 (3rd Cir. 2001)). This argument is unavailing.

A.M. and A.T.'s subjective intent to display the Confederate battle flag as an expression of pride in their Southern heritage, rather than as a symbol of racism, is not dispositive. The Court recognizes that the Confederate battle flag has a dual meaning. To some it is simply a historical symbol of Southern heritage that signifies ancestral pride and respect. However, to many others, it remains a symbol of oppression, racial subordination, and slavery.[6] Regardless of A.M. and A.T.'s intent in displaying the Confederate battle flag,

---

[6] *See D.B. ex rel. Brogdon*, 217 F. App'x at 524 ("[E]ven if some recognition of the flag's racially divisive nature is implicit in the district court's finding, that finding is not rendered clearly erroneous thereby."); *Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811, 824 (4th Cir. 2004) ("Unfortunately, to its supporters at the time of its creation as well as some proponents today, the Confederate flag undeniably represented, and represents, support for slavery, belief in Blacks as an inferior class, and opposition to the Republic. . . . Indeed, many offended by the Confederate flag find more current connections to oppression as the

it is certainly within reason to assume that some would take the display as an expression of racial animus and prejudice. *See Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811, 823 (4th Cir. 2004) ("Because there are citizens who not only continue to hold separatist views, but who revere the confederate flag precisely for its symbolism of [racial separation], it is not an irrational inference that one who displays the confederate flag *may* harbor racial bias against African-Americans." (emphasis in original)). Thus, given the recent history of racial hostility at BHS, particularly in light of the overt use of the flag as a racist symbol by some BHS students, BHS authorities had a reasonable basis for concluding that display of the Confederate battle flag would cause significant disruption, regardless of the specific individual's intent in displaying it. *See Denno v. Sch. Bd. of Volusia County, Fla.*, 218 F.3d 1267, 1274 n.6 (11th Cir. 2000) (stating that the student's innocuous intent in displaying the Confederate battle flag is not dispositive; rather, "[t]he more relevant factor is that the school official might reasonably think that other students would perceive the display as racist or uncivil"). Accordingly, Plaintiffs have failed to demonstrate that they are likely to succeed

---

flag became an unfortunate symbol of the South's resistance to integration and equality from the late 1940s to the 1960s."); *Briggs v. Mississippi*, 331 F.3d 499, 506 (5th Cir. 2003) ("It is common knowledge that public reaction to and debate over the flying of the Confederate Battle flag, or its being a part of a state flag, has been virtually exclusively in relation to its symbolism of the Confederacy and the valor of its troops and whether and to what extent this symbolism extols or excuses slavery, racial oppression and resistance to racial equality."); *Castorina*, 246 F.3d at 542 (implicitly recognizing that the Confederate battle flag is a "controversial and racial political symbol"); *West*, 23 F. Supp. 2d at 1233 ("[I]t is a fact that the Confederate flag was adopted by those in America whose purpose was to preserve a system that permitted the enslavement of African-Americans. To many . . . displaying this flag today represents an expression of continuing contempt for the rights of African-Americans to participate fully and equally in American society.").

on the merits of their First Amendment claim and the Court therefore denies the Plaintiffs' motion for preliminary injunction with regard to that claim.[7]

### IV. PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THEIR FOURTEENTH AMENDMENT CLAIMS

Plaintiffs also assert that enforcement of the BHS dress code violates A.M. and A.T.'s Fourteenth Amendment rights to due process and to equal protection of the laws. Plaintiffs have failed to demonstrate that they are likely to succeed on the merits of these claims; the Court therefore denies the Plaintiffs' motion for preliminary injunction.

#### *A. Due Process Claim*

Plaintiffs assert that enforcement of BHS's dress code violates A.M. and A.T.'s Fourteenth Amendment right to due process of law because the dress code is unconstitutionally vague and leaves enforcement to the unbridled discretion of school authorities. The BHS dress code would be unconstitutionally vague if a reasonable student of ordinary intelligence who read the policy could not understand what conduct the policy prohibited. *West*, 206 F.3d at 1368 (citing *Broaderick v. Oklahoma*, 413 U.S. 601, 608 (1973)). The Supreme Court has recognized, however, that "given the school's need to be

---

[7] The Court notes that its analysis of Plaintiffs' First Amendment claim is consistent with the conclusions of other courts that have addressed similar challenges to a school's ban on the display of the Confederate battle flag. The Court merely follows the majority of these courts in deferring to the school officials' determination regarding the potential disruptivenss of the Confederate battle flag when those officials have a reasonable basis for that determination. *See, e.g.*, *D.B. ex rel. Brogdon v. Lafon*, 217 F. App'x 518, 523-24, 2007 WL 541594, at *4 (6th Cir. 2007); *Scott v. Sch. Bd. of Alachua County*, 324 F.3d 1246, 1249 (11th Cir. 2003); *Melton v. Young*, 465 F.2d 1332, 1335 (6th Cir. 1972); *West*, 206 F.3d at 1366-67; *Phillips*, 987 F. Supp. at 493.

able to impose disciplinary sanction for a wide range of unanticipated conduct disruptive of the educational process . . . school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions." *Fraser*, 478 U.S. at 686; *see also Murray v. W. Baton Rouge Parish Sch. Bd.*, 472 F.2d 438, 442 (5th Cir. 1973) (recognizing that "school disciplinary codes cannot be drawn with the same precision as criminal codes and that some degree of discretion must, of necessity, be left to public school officials to determine what forms of misbehavior should be sanctioned.").

Plaintiffs do not claim that BHS's dress code fails to give students fair notice of what clothing is or is not allowed, nor do they claim that A.M. and A.T. were unaware that the policy prohibited display of the Confederate battle flag. Rather, Plaintiffs assert that the BHS dress code provides school officials unfettered discretion to determine what is prohibited by the policy, such that school authorities may suppress only those viewpoints with which they disagree. The Court construes this argument as another assertion that BHS's policy prohibiting display of the Confederate battle flag is a viewpoint-specific regulation. As previously discussed, however, in the school context, viewpoint-specific regulations are permissible if the school can demonstrate facts providing a reasonable basis for concluding that the regulated speech may cause substantial disruption, even if the regulation would be impermissible outside the school setting. *Tinker*, 393 U.S. at 514. Where, as here, the school district has met the *Tinker* standard, a viewpoint specific regulation is justified. Thus, Plaintiffs have failed to demonstrate a likelihood of success on their Fourteenth Amendment

due process claim and the Court denies the Plaintiffs' motion for preliminary injunction with respect to that claim.

### *B. Equal Protection Claim*

Plaintiffs also argue that BHS authorities have violated A.T. and A.M's Fourteenth Amendment right to equal protection by discriminating against students who wish to express pride in their Southern heritage by displaying the Confederate battle flag.  According to Plaintiffs, BHS authorities have not prohibited the display of other controversial racial and political symbols, such as the swastika, nor have they enforced the dress code against students who display such symbols.  However, Plaintiffs have not demonstrated that they are likely to succeed on the merits of this claim either.

First, BHS authorities submitted affidavits demonstrating that the dress code is, to the best of their ability, consistently applied and uniformly enforced against students who violate the policy.  Plaintiffs allege that school authorities failed to require one student to stop wearing a jacket with a swastika patch.  While this creates a contested fact issue, it is not enough to demonstrate that Plaintiffs are likely to succeed on the merits of their claim.

Second, the Court notes that Plaintiffs' equal protection argument is essentially one of viewpoint discrimination prohibited by the First Amendment.  As previously discussed, BHS has shown that the prohibition on Confederate battle flags is justified under *Tinker*; therefore the school may prohibit the Confederate battle flag even though such speech would be protected outside the school environment.  *See West*, 23 F. Supp. 2d at 1235-36.  Furthermore, Plaintiffs' have not alleged, nor have they provided any evidence to show, that

other controversial symbols have caused significant disruption at BHS. *See Phillips*, 987 F. Supp. at 494. Accordingly, Plaintiffs have failed to show a likelihood of success on the merits, and the Court denies Plaintiffs' motion for preliminary injunction with respect to their equal protection claim.

## CONCLUSION

This Court was not elected to run the Burleson Independent School District. Nor is this Court charged with deciding whether the display of the Confederate battle flag at BHS would be so disruptive that it should be prohibited. Rather, this Court's limited role is to determine whether those persons actually charged with such duties acted outside their considerable discretion. Based on the recent history at BHS, as shown in the preliminary injunction record, the Court finds that the school officials acted within the discretion permitted them under the First and Fourteenth Amendments. The Court therefore denies the Plaintiffs' motion for preliminary injunction.

Signed July 10, 2007.

_____
David C. Godbey
United States District Judge